Filed 3/3/21  In re A.E. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.E. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E076020 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1900179) |
| v. | OPINION |
| M.E., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Matthew C. Perantoni, Judge. Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand, and Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

1

M.E (mother) appeals an order terminating her parental rights and freeing her two sons for adoption by their current caregiver, their maternal grandmother. Mother argues the court erred in failing to apply the parental benefit exception when considering which permanent plan to select for the boys. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), unlabeled statutory citations refer to this code.) We find no error.

On this record, the juvenile court could reasonably conclude that the maternal grandmother is the only adult who has occupied the parental role in these boys' young lives. Both boys tested positive for methamphetamine at birth and have spent their entire lives under the maternal grandmother's care. Though many of mother's visits and contacts during the pendency of this proceeding have gone well, positive experiences, even consistent ones, do not on their own constitute a compelling reason to deprive a dependent child of the permanency benefits of adoption. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316.) During the reunification period, mother failed to address the substance abuse issues that led to her sons' removal and failed to occupy a parental role in their lives. By all accounts, the boys are doing well in their current home and there is no evidence they would suffer significant detriment from the termination of mother's parental rights. We therefore affirm.

# I

# FACTS

The subjects of this dependency are mother's two oldest sons, Arsyn, who was born in February 2017 and is now four years old, and Sean, who was born in April 2019 and is now almost two years old. The boys have different biological fathers.

A. *Detention*

Mother first came to the attention of the Riverside County Department of Public Social Services (the department) in 2017, when she tested positive for methamphetamines and marijuana at the birth of her first son, Arsyn. Two years later, when she gave birth to Sean, they both tested positive for methamphetamines and marijuana, and Sean also tested positive for amphetamines. A department social worker went to the hospital to investigate and interview mother. Hospital staff informed the social worker that mother had not received any prenatal care during her pregnancy and had admitted to using methamphetamine throughout her pregnancy. The social worker then interviewed mother, who admitted having a long history of methamphetamine and marijuana use. She said she had used meth multiple times a day for many years and had smoked it within two days of Sean's birth. She said she had been living with her mother (the maternal grandmother), but recently moved in with a friend whose home was "full of people using drugs together."

The social worker also interviewed the maternal grandmother and mother's sister (the maternal aunt). The aunt said mother and Arsyn had lived with her for several months after his birth in 2017. The aunt had helped mother care for Arsyn "until [mother's] behavior of leaving and not caring for the baby became too much to tolerate." Mother then moved in with the maternal grandmother, who according to both the aunt and the grandmother, acted as the primary caretaker while mother resided there.

The grandmother reported that mother was rarely home when she lived with her. She would spend her time hanging out with friends or Arsyn's father, leaving the grandmother to care for the infant on a daily basis. On the rare occasions mother was home with Arsyn, she would bring him to the grandmother for basic care like changing his diaper. The grandmother told the social worker she was able to care for both boys. She said she was already financially responsible for Arsyn and could be for Sean as well.

On April 9, 2019, four days after Sean's birth, the department filed dependency petitions for the boys. Relevant here, the petitions alleged the children fell under section 300, subdivision (b) (failure to protect). The following day, the juvenile court ordered the boys detained from mother's care and placed them with the grandmother.

B.     *Jurisdiction and Disposition*

The boys did well in the grandmother's care leading up to the jurisdiction and disposition hearing. They both appeared bonded to her, and she was meeting their needs. Arsyn was healthy, received his first round of immunizations, and grandmother intended to request a speech therapy referral at his scheduled physical. Sean was eating and

4

sleeping well and appeared to be developmentally on track. Mother missed two visits during this time, but she was attentive and behaved appropriately at the ones she did attend.

The juvenile court held the jurisdiction and disposition hearing on June 11, 2019. It adjudged the boys dependents, removed them from mother's care, and ordered the department to provide her with six months of family reunification services.[1]

C.      *Six-Month Review Period*

Mother's case plan included substance abuse treatment, drug testing, counseling, and a parenting education program. Her participation in services during this period was sporadic and minimal. She spent a week in an inpatient treatment facility and about a week in an outpatient treatment program, and she tested negative in May 2019. However, for the next several months (through October 2019) she failed to appear for testing.

In addition, mother was late to, or missed, many visits during the reunification period. She missed visits during the entire month of August because she was in custody for failing to appear in court for several outstanding cases. When she did attend visits, the supervisor observed she had difficulty showing she could manage both boys at once. On several occasions, she left the infant, Sean, unattended while she chased after Arsyn.

---

[1] The court also removed the boys from their fathers' care and denied each father reunification services (Arsyn's father because he was unavailable within the meaning of § 361.5, subd. (a), and Sean's because he had failed to reunify with his children in three previous dependencies). We do not discuss the fathers any further in this appeal, as they are not parties and their circumstances are irrelevant to resolution of mother's challenge.

During one visit that took place at her inpatient treatment facility, staff had to keep an eye on Arsyn because she was off showing Sean to people.

The six-month review hearing took place on December 4, 2019. The department recommended terminating mother's services because she hadn't made sufficient progress on any portion of her case plan or on mitigating the circumstances that led to the initiation of the case. The juvenile court agreed and terminated her reunification services. It set a permanency planning hearing under section 366.26 and reduced mother's visits to twice a month.

D. *Termination of Parental Rights*

In January 2020, mother entered an inpatient substance abuse facility on her own initiative, and her first two monthly visits with the boys took place at the facility. However, in March, in response to the COVID-19 pandemic, visitation was transitioned to remote formats, and didn't return to in-person until June. According to the supervisor, mother played appropriately with the children but struggled with the disciplinary or structural aspect of visits, like providing redirection and consequences for inappropriate behavior.

In July 2020, mother gave birth to a baby girl who tested positive for methamphetamines. The department detained the newborn and placed her in the maternal grandmother's care.

Meanwhile, the boys continued to thrive in the maternal grandmother's care, and she wanted to adopt them. She said she already considered them her own children and

was committed to meeting their needs and providing them with the tools needed for a successful future. Arsyn and Sean were very bonded to her and seemed happy in her home. The department described Arsyn as affectionate, warm, and smart. He went to speech therapy twice a week, and his speech was reportedly improving. He was eating well and sleeping through the night. The department described Sean as intelligent, active, and observant. In their adoption assessment, they concluded the maternal grandmother was a good caretaker for the boys, and they recommended terminating mother's parental rights and selecting adoption as the boys' permanent plan.

In August 2020, mother filed section 388 petitions requesting additional time and services to reunify with her sons. She said she had participated in a substance abuse program, an anger management class, and a parenting class on her own initiative. She also said she was going to therapy and attending 12-step meetings.

The combined section 388 and permanency planning hearing took place on October 5, 2020. Mother and the social worker testified. Mother said she had completed a residential treatment program and re-enrolled after her daughter was born. She said she had tested negative throughout her time in treatment and had completed an anger management class. She also said she had secured housing and employment and was maintaining her sobriety. Regarding her relationship with the boys, she said they were always excited to see her during visits, went right to her, and called her "mama." She said Arsyn would throw tantrums at the end of visits and did not want to leave. She said she

enjoys visits and looks forward to them, but that they're also "a lot with three kids." She said she loves her sons very much and shares a strong bond with them.

The social worker testified that mother was appropriate during visits and showed the boys love and affection. However, she also said mother struggled to handle both boys by herself and that it was helpful to have other people around during visits. She described mother's relationship with the children during visitation as that of a playmate. She agreed that Arsyn struggled at the end of visitations, but in her view that was because he was upset with "fun time being over . . . and having to go back to a more structured environment." She said the boys were "extremely bonded" to the grandmother.

Mother's counsel argued the parental benefit exception to terminating parental rights applied. The juvenile court disagreed, denied mother's section 388 petition, and terminated her parental rights. Mother appealed.

## II

## ANALYSIS

Mother argues the trial court erred by concluding the parental benefit exception does not apply. We disagree.

At the section 366.26 permanency planning hearing, the juvenile court selects and implements a permanent plan for the dependent child or children. The court may order adoption, guardianship, or long-term foster care as the permanent plan. (*In re Collin E.* (2018) 25 Cal.App.5th 647, 663.) When a dependency reaches this stage, it means the parent has failed to reunify with their children, and, at that point, the focus shifts from

8

keeping the family together to the needs of the children for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 ["By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount"].) As a result, the Legislature prefers adoption as the permanent plan where possible. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.)

If the juvenile court finds the child or children adoptable, the parent bears the burden of proving an exception to terminating parental rights applies. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) The parental benefit exception at issue here applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i).)

Beginning with *In re Autumn H.* (1994) 27 Cal.App.4th 567, our appellate courts have routinely interpreted the exception to apply to only those parent-child relationships the severance of which "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*Id.* at p. 575; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1347-1348; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1161.) While it's not necessary for the parent to prove they have maintained "day-to-day" contact or that the child's "'primary attachment'" is to them (*In re S.B.* (2008) 164 Cal.App.4th 289, 299), the parent must demonstrate they occupy a beneficial *parental* role in the child's life. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420 [the exception applies "to situations where a dependent child benefits from a continuing parental relationship; not one…[where] a parent has frequent contact with but does not stand in a parental role to the child"].)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be *detrimental* to the child and *outweighs* the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51, italics added.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive emotional*

10

*attachment* such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re J.C.* (2014) 226 Cal.App.4th 503, 528-529, italics added.)

We review the court's finding on the existence of the beneficial parental relationship for substantial evidence. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) And whether "the relationship is a 'compelling reason' for finding detriment to the child" is a "'quintessentially' discretionary decision" that we review for abuse of discretion.[2] (*Id.* at p. 1315.)

On this record, we do not reach the second prong of the analysis—the juvenile court's discretionary decision—because there is insufficient evidence that a beneficial parent-child relationship exists between mother and her sons. Even if we ignore the visits mother missed during the reunification period and accept her argument that she maintained consistent visitation and was a "positive presence" for her sons, the record contains no evidence she occupied a parental role in their lives. From the outset, she failed to act as a protective parent. Arsyn tested positive for methamphetamine and other substances at birth, as did Sean, two years later (and, regrettably, as did mother's youngest child, born after she failed to reunify with her sons).

---

[2] "Appellate courts are divided over the appropriate standard of review for an order concerning the applicability" of the parental bond exception. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) Some have reviewed the decision for abuse of discretion and others for substantial evidence. Other courts have combined the two and taken a hybrid approach, as we do. (*Ibid.*) Our Supreme Court recently granted review of the issue. (*In re Caden C.* (2019) 444 P.3d 665.)

Putting aside mother's drug use during her pregnancies, the record contains no indication she assumed the role of parent or caretaker for either son. Even before the department began its investigation in this dependency, mother was not the primary caretaker of Arsyn. That role was occupied by the boys' current caretaker, the maternal grandmother, who said mother was rarely home during Arsyn's infancy and when she was, would look to her to provide basic care for the baby. The maternal aunt, with whom mother and Arsyn resided briefly after his birth, provided a similar account. She was so concerned about mother's ability to safely parent the newborn that she wrote a letter to the department explaining she had not left mother unsupervised with him when they lived with her. Sean, detained a few days after his birth, has never lived in the same home as mother.

We credit mother for the services she completed on her own initiative after the reunification period ended but, unfortunately, when it comes to the relevant issue for this appeal—whether she has occupied the role of a parent (not whether she ultimately took steps to address the issues that led to this dependency) the record is emphatically clear. Because the boys are so young and mother has never been their primary caretaker, there is simply no evidence of a beneficial parental relationship.

In addition to the progress she made after the reunification period ended, mother points to her love for her sons and the evidence they enjoyed visiting with her. But those truths are simply not enough to establish a beneficial parental role, let alone qualify as a compelling reason to forgo adoption. And while it is undisputed Arsyn had difficulty

12

parting with mother at the end of visits, that fact does not compel the conclusion that mother occupied a beneficial parental role. Rather, the juvenile court could instead reasonably infer that Arsyn viewed mother as a playmate and—especially given his young age—didn't want the fun to come to an end. (See *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1316 [parental benefit exception did not apply where "[a]t best, mother's supervised interactions with [her daughter] amounted to little more than playdates for [her] with a loving adult"].)

The cases mother relies on for support do not help her position because they are easily distinguishable. In *In re Amber M.* (2002) 103 Cal.App.4th 681, two of the three children had been in the mother's care for years before detention, and the psychologist, therapists, and court-appointed special advocate all opined the parental relationship "clearly outweigh[ed]" the benefit of adoption. (*Id.* at p. 690.) In *In re E.T.* (2018) 31 Cal.App.5th 68, the mother's twin children were consistently anxious, uncertain, and fearful outside of her care, especially after visits, and their anxiety over where they were going to live was "persistent." (*Id.* at p. 72.) Mother successfully reunified with them before suffering a relapse. By the time of the permanency planning hearing, the twins were still experiencing anxiety and the social services agency told the court it believed the mother "should always be a presence in the children's lives." (*Id.* at p. 73.) The most obvious difference in this case is that mother never spent a significant period of time as the boys' primary caregiver and the record contains no evidence they have or will suffer harm if adopted by their maternal grandmother.

We do not doubt that mother loves her sons, but a parent's affection is an insufficient reason to warrant foregoing an adoption in a safe and stable home once reunification efforts have failed. Our courts have emphasized time and again that positive or even loving contacts, on their own, aren't enough to outweigh the permanency benefits of adoption, especially when the children have developed a bond with the current caregiver, as the boys have here. "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "'Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.'" (*In re C.F.* (2011) 193 Cal.App.4th 549, 557.) The juvenile court correctly determined that the parental benefit exception does not apply.

## III

## DISPOSITION

We affirm the order terminating mother's parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

CODRINGTON
Acting P. J.

RAPHAEL
J.

14